**FILED**

5/27/2024

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AO 91 (Rev. 11/11) Criminal Complaint                              AUSA Misty N. Wright (312) 886-2061

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

RAVI KAPADIA

CASE NUMBER: 24 CR 265

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or around April 2018 through on or around April 2020, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 371 | conspiracy to commit an offense against the United States, namely, entry of goods by means of false statements, in violation of 18 U.S.C. § 542 |

This criminal complaint is based upon these facts:

_X_   Continued on the attached sheet.

/s/ Matthew T. Gauder (MDW w/ permission)
MATTHEW T. GAUDER
Special Agent, Homeland Security Investigations
(HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: May 27, 2024

*Judge's signature*

City and state: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**<u>AFFIDAVIT</u>**

I, MATTHEW T. GAUDER, being duly sworn, state as follows:

1.      I am a Special Agent with Homeland Security Investigations ("HSI"). I have been so employed since approximately 2008. Before that, I was an employee of United States Customs and Border Protection ("CBP") beginning in 2003. I am responsible for investigating violations of federal laws relating to, among other things, the entry of goods into the commerce of the United States by false statements, in violation of Title 18, United States Code, Section 542. I have been involved in undercover investigations, the management and debriefing of cooperating sources, interviews of witnesses and defendants, and tracing of fraudulently obtained funds.

2.      This affidavit is submitted in support of a criminal complaint alleging that RAVI KAPADIA has violated Title 18, United States Code, Section 371 by conspiring with Individual G, Individual H, and others to enter goods into the United States by means of false statements, in violation of Title 18, United States Code, Section 542 (the Subject Offense). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging KAPADIA with the Subject Offense, I have not included each and every fact known to me concerning this investigation. I have set forth only the

facts that I believe are necessary to establish probable cause to believe that the defendant committed the Subject Offense alleged in the complaint.

3.     The information set forth in this Affidavit is based on my personal knowledge; information provided by other law enforcement officers and governmental agencies, and others with knowledge of the events described below; and information obtained from public records and computer database searches.

**A.     Background Information**

**1.     Legal Framework for the Importation of Goods into the United States**

4.     CBP and HSI are charged with detecting, interdicting, and investigating fraudulent activities intended to avoid the payment of duties, taxes, and fees, and activities meant to evade the legal requirements of international traffic and trade at U.S. ports of entry.

5.     CBP and HSI are responsible for administering the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1202-1683g ("Tariff Act"), as well as bilateral trade agreements between the United States and other governments, including Oman. Among other things, the Tariff Act empowers CBP to assess and collect duties, taxes, and fees on merchandise imported into the United States, and to investigate smuggling and fraud relating to the collection of revenue on imported merchandise.

6.     The Tariff Act, and the regulations promulgated thereunder, require certain procedures to be followed upon the importation of goods into the United States.  Pursuant to 19 U.S.C. § 1484, the importer must file "entry" documents with CBP for the merchandise being imported providing specific information

relating to the imported goods. These documents include invoices, visas, bills of lading, packing lists, and CBP Forms 3461 ("Entry/Immediate Delivery") and 7501 ("Entry Summary"). Forms 3461 and 7501 require importers to provide specific and truthful information relating to imported merchandise, including a description of the merchandise and the merchandise's manufacturer, value, and country of origin.

7. Under the Customs Modernization Act, *see* Title VI of the North American Free Trade Agreement Implementation Act, P.L. 103-182, 107 Stat. 2057, the importer is required to declare the value, classification, and rate of duty applicable to entered merchandise. 19 U.S.C. § 1484(a)(1)(B).

8. CBP uses the statements on the invoice submitted by the importer that identify the country of origin and the total price paid or payable for the goods to determine the transaction value of the imported merchandise, pursuant to 19 U.S.C. § 1401a(b); the proper tariff rate; and to calculate CBP duties for the entry.

9. The bilateral trade agreement between the United States and Oman is the United States–Oman Free Trade Agreement (the "OFTA").[1] Free trade agreement regulations applicable to the OFTA are in Title 19 of the United States Code of Federal Regulations, Sections 10.861 to 10.890. Free trade agreement verification audits are generally conducted by CBP Import Specialists assigned to Centers for Excellence and Expertise ("CEEs").

10. As part of its review procedure, CBP relies on importers of record to provide various information to substantiate any claim made for preferential tariff

---

[1] The OFTA was signed by the Governments of Oman and the United States on January 19, 2006 and approved by Congress on September 26, 2006.

treatment under the OFTA. The OFTA requires an importer claiming preferential tariff treatment for a good to maintain, for five years after the date of the claim for preferential tariff treatment, all records and documents necessary for the preparation of the CBP declaration. 19 C.F.R. § 10.867 (Maintenance of records). The OFTA also requires the importer to submit, at the request of the CEE director, a declaration setting forth all pertinent information concerning the growth, production, or manufacture of the good. 19 C.F.R. § 10.864 (Declaration).

11.     The Automated Commercial Environment ("ACE") is CBP's official system of record for all CBP entry summaries (CBP Form 7501) and other import-related documents. Currently, over 99%[2] of all entry summaries are filed electronically with CBP using portal interfaces. To do this, importers of record provide information about their importations (*e.g.,* commercial invoice, packing list, bill of lading from the shipment carrier, for example, the airline) to their licensed customs broker, who in turn electronically transmits to CBP the data in summary form. CBP also uses the ACE system to issue requests for information from the importer and to make changes to CBP entries involving tariff classifications, duties, taxes, and fees.

---

[2]*See*                          https://www.cbp.gov/sites/default/files/assets/documents/2021-Jan/ACE%20Entry%20Summary%20Business%20Rules%20and%20Process%20Document%20Trade%20Version%2010.25%20Revised.pdf#:~:text=Ninety-six%20percent%20of%20all%20entry%20summaries%20filed%20are,compliance%20and%20payment%20of%20duties%2C%20taxes%2C%20and%20fees (last accessed on May 27, 2024).

### 2.    Duty Rates for Gold Jewelry

12.    The Harmonized Tariff Schedule of the United States ("HTSUS") classifies merchandise based on its name, use, and/or the material used in its construction.[3] The HTSUS is CBP's primary resource for determining tariff classifications for goods imported into the United States and the duties that must be paid based upon those classifications.

13.    The HTSUS instructs that gold jewelry is classified under heading 7113.[4] Absent a statute or directive to the contrary, the duty rate for gold jewelry imported into the United States is 5.5 percent or 5.8 percent of its value, depending on the type of gold jewelry.

14.    Certain gold jewelry from Oman is eligible for duty-free treatment under the OFTA. Generally, to qualify, gold jewelry must be *wholly* the growth, product, or manufacture of Oman or of the United States, or both; or have become a new or different article of commerce that has been grown, produced, or manufactured in the territory of Oman or of the United States, or both (*e.g.*, 24 karat gold and alloy that is manufactured into gold jewelry in Oman).  In order to qualify as a new or different "article of commerce," a good must be manipulated in a way that changes its tariff classification number.  For example, gold jewelry that was manufactured in a country other than Oman and then exported from Oman as

---

[3] *See* https://www.usitc.gov/tata/hts/archive/index.htm; 19 U.S.C. § 1202.

[4] The full tariff classification number consists of ten digits. Each digit provides specific data used to systematically produce an increasingly accurate description of the item. Heading 7113 provides for, generally, "articles of jewelry and parts thereof, of precious metal or of metal clad with precious metal."

gold jewelry would not be a new or different article of commerce, even if it had been altered in Oman.

15.     If gold jewelry meeting OFTA qualifications is imported into the United States, then no customs duties are assessed. Alternatively, non-qualifying gold jewelry is subject to the HSTUS duty rate in effect at the time of importation. By way of example, if the transaction value of Indian-origin gold jewelry is $1 million, a duty rate of 5.5% *ad valorem* would require a payment to CBP of $55,000 in customs duties (*i.e.,* $1 million x 5.5%). On the other hand, no customs duties would be assessed against *bona fide* Oman-origin gold jewelry with a transaction value of $1 million. This example illustrates how identification of the country of origin for gold jewelry can substantially increase or decrease the customs duties an importer is required to pay for entry of that gold jewelry into the United States.

**B.     Probable Cause**

**1.     Summary of Probable Cause**

16.     In summary, as described further below, between April 2018 and April 2020, KAPADIA was employed as an accountant at Company N, an United Arab Emirates (UAE)-based company run by Individual H that imports and exports gold jewelry. According to CBP records, Company M, a Naperville, Illinois-based company run by Individual G, imported gold jewelry from Company N. From approximately April 2018 through April 2020, KAPADIA conspired with others, including Individual H and Individual G, to enter goods into the United States by means of false statements, in violation of Title 18, United States Code, Section 542,

by falsifying documentation to make it appear as though the gold jewelry sent by Company N to Company M was manufactured in Oman, a country from which it would not be subject to tariffs. CBP estimates that, as a result of these false statements, Company M has avoided paying at least approximately $11 million in tariffs.

### 2. Company M Is an Importer of Gold Jewelry Located in Naperville, Illinois

17. Company M has been a registered importer of record of gold jewelry into the United States since approximately May 2016. Information from the Illinois Secretary of State reflects that Individual G has served as President of Company M since approximately 2015, and Company M is located in Naperville, Illinois

18. On or about January 21, 2022, Individual G arrived at Chicago's O'Hare International Airport following a trip to India. During a CBP inspection, Individual G told officers that he was the owner of Company M and operates it from his Naperville residence. Individual G described Company M as a "jewelry wholesaler" that imports jewelry into the United States from "Oman and other countries."

### 3. From May 2016 through October 2021, Company M Imported Gold Jewelry from Company N, and Customs Forms Associated with These Imports Identified the Origin as Oman

19. According to agents' observations during a site visit and to documents obtained from Emirates Airlines, Company N is an importer and exporter of gold jewelry headquartered in Dubai, UAE. As described below, KAPADIA identified

Individual H as the owner of Company N. Pursuant to communications obtained from Individual G's telephone pursuant to a search warrant, Individual H directs the activities of Company N.

20. According to CBP records, from approximately May 2016 through October 2021, Company M filed approximately 237 CBP entries for gold jewelry purportedly manufactured in Oman, with Company N designated as the shipper on the airway bill supporting each entry. The total declared value of these imports purportedly from Oman was approximately $210 million. If assessed a customs duty of 5.5%, such imports would be subject to over $11 million in duties owed to the United States.

21. In May 2022, law enforcement obtained a warrant to search Company M's business premises and electronic devices within it. Pursuant to that search warrant, law enforcement obtained message exchanges between Individual G and Individual H and others associated with Company N, in which Company N sent invoices and ledgers relating to gold jewelry from India-based and UAE-based suppliers. Law enforcement observed communications in which Company M employees placed orders from Company N for gold jewelry. Law enforcement also obtained airline tickets showing that Individuals G and H traveled together to India in approximately April 2018. Documents further indicated that Individual G, on behalf of Company M, and Individual H, on behalf of Company N, presented together with Indian and UAE jewelry manufacturers at an annual international jewelry trade show in the United States.

22. According to records obtained from the Company M search warrant and to financial records, Company M wired money to Company N dozens of times from 2016 through 2021.

**4. KAPADIA, As an Employee of Company N, Provided False Statements about Company N's Gold Shipments to Company M to the Shippers, Knowing that the False Statements Would Be Used to Enter the Goods Into the United States**

23. Based on my training and experience, and based on records obtained from Emirates Airlines, I know that in order to ship goods via air to the United States, a person must submit Instructions for Dispatch of Goods. In those instructions, the person must identify the shipper/origin of the goods and the consignee and must describe the goods being shipped, among other information. The person submitting the dispatch form must certify that the information in the form is correct. Based upon that information, the carrier generates an airway bill, which is provided to U.S. Customs for entry of the goods into the United States. U.S. Customs relies on the accuracy of the shipper's information included in the airway bill, including the country of origin information provided by the shipper.

24. Airway bill AWB 176-07137701, obtained from Emirates Airlines, was used to enter gold jewelry into the United States in CBP entry BFH-0900362-2 in January 2019. According to Emirates Airlines, the dispatch form used to populate the fields on that airway bill was filled out on or about January 21, 2019, and was signed and certified as true by KAPADIA. The form identified the consignee as Company M and the shipper/origin as Company G – Oman c/o Company N.

25. CBP routinely conducts post-CBP entry release free trade agreement verification audits to ensure that duty-free status is being properly claimed. In or around May 2019, CBP initiated a free trade agreement verification audit on Company M's CBP entry BFH-0900362-2. Company M had claimed that the jewelry was manufactured in Oman by Company G. CBP requested that Company M provide information to substantiate that the gold jewelry from that entry qualified for preferential treatment under OFTA. On or about July 12, 2019, Company M provided to CBP a bill of particulars, meaning a breakdown of the materials and labor used in the manufacture of that shipment, and information about purported employees of Company G and their wages.

26. In order for Company M to submit that information to CBP, according to WhatsApp messages obtained from the search of Individual G's phone, Individual G had a conversation with KAPADIA.[5] On or about June 30, 2019, KAPADIA sent a message to Individual G containing a screenshot of an excel spreadsheet that stated, "Please find below the breakdown of cost and profit for the shipment of […] under our invoice number 05091 dated 21.01.2019," followed by a chart of "Particulars" and a dollar amount, e.g. "cost of gold," "448687." On or about July 2, 2019, KAPADIA sent Individual G a screenshot of another excel spreadsheet entitled, "Extract of workers list engaged in production for invoice number 05091 dated 21.01.2019," followed by purported worker names, details of work, and

---

[5] The telephone number that KAPADIA was using at that time was the same telephone number he provided in support of applications for visas to visit the United States in 2018 and 2019.

salaries. Later that same day, KAPADIA sent Individual G a screenshot of the same worksheet with edited content, with Company G's name at the bottom. Later that same day, KAPADIA sent Individual G a screenshot of his conversation with Individual H, in which Individual H directed KAPADIA how many employees to list and what their job details should be and directed him to "Call uncle and say i'm saying this." As described below, KAPADIA identified "uncle" as Individual G.

27.     However, the employees purportedly working for Company G do not appear to be trained or qualified to produce gold jewelry. According to information obtained from the Omani government by the investigator, most of the individuals depicted on the identity documents were admitted into Oman from Pakistan to work in construction trades (*e.g.,* brick and concrete work), and *not* as jewelers or jewelry manufacturers. Additionally, according to the Royal Sultanate Police of Oman, none of the purported employees were sponsored for immigration purposes by or on behalf of Company G.

28.     On or about May 27, 2024, KAPADIA arrived to Newark Liberty International Airport in Newark, NJ on a flight from Dubai, UAE. KAPADIA was referred for a secondary inspection at approximately 9:25 a.m. During his secondary inspection interview by CBP officers, KAPADIA stated that he had come to the United States for an annual international jewelry trade show and that he had shipped jewelry to the United States for the show that was anticipated to arrive the following day. At approximately 10:01 a.m., HSI agents Mirandized KAPADIA, and

KAPADIA signed a written Miranda waiver. Subsequently, KAPADIA told law enforcement the following, in summary and in part:

a.   KAPADIA was employed as an accountant for Company N in Dubai, UAE from approximately April 2018 through April 2020. He reported to Individual H.

b.   Company N is a jewelry importer and exporter. Over 80% of Company N's gold jewelry imports into UAE are from India. Company N also bought for export gold jewelry from suppliers in the UAE. During KAPADIA's time at Company N, Company N imported gold jewelry from Oman a few times in small quantities.

c.   Individual G is the owner of Company M. Company M was Company N's primary customer in the United States during KAPADIA's tenure there. Virtually all of the gold jewelry that Company N sent to Company M was of Indian and UAE origin, and some was from Turkey and Malaysia.

d.   Company N falsely reported that its gold jewelry for Company M was made in Oman instead of reporting that it was made in India or the UAE.

e.   KAPADIA delivered CBP entry BFH-0900362-2 to Emirates Airlines in the UAE on or about January 21, 2019. KAPADIA wrote on the dispatch form for airway bill AWB 176-07137701 that the gold was from Company G – Oman, when, in fact, he knew it wasn't from Oman. KAPADIA knew that the false information on the dispatch form would be provided to U.S. Customs when the shipment arrived to the United States.

f.     KAPADIA also provided a customs declaration to UAE Customs (#303-04293701-19) in Dubai, dated January 21, 2019, that declared the gold for CBP entry BFH-0900362-2 was not from Oman but rather was from India, which is where he knew the gold was actually from.

g.     Throughout his time at Company N, KAPADIA wrote on other dispatch forms for shipment to Company M that the gold jewelry was from Oman, which he knew was false. Specifically, at Individual H's direction, KAPADIA delivered shipments of gold to shippers such as Emirates Airlines with dispatch forms that he prepared and that he knew falsely claimed the gold jewelry was made by Company G in Oman. It was KAPADIA and another Company N employee's job to do so.

h.     On or about June 30, 2019, at Individual H and Individual G's direction, KAPADIA, while in the UAE, created the spreadsheet identified above that included the cost breakdown report for the January 21, 2019 shipment of gold jewelry purportedly from Oman. He knew that the numbers and other particulars were false; Individual H made them up. KAPADIA messaged via WhatsApp this information to Individual G. KAPADIA identified the person the Individual H called "uncle" in the message referenced above as Individual G.

i.     About one month later, Individual H told KAPADIA that he was creating this information to respond to a U.S. Customs issue that Company M and Individual G were having. On or about July 2, 2019, and August 20, 2019, at Individual H and Individual G's direction, KAPADIA created additional

spreadsheets with information about this shipment that he knew was false. By August 20, 2019, KAPADIA knew that this false information was being created because of Company M's issue with U.S. Customs.

### 5.    Company G Is Not Actually a Gold Manufacturer

29.    Since 2016, Company M has filed[6] CBP entry forms declaring that gold jewelry it imported from Oman was manufactured by approximately 10 different Omani companies, including Company G. As described below, approximately 8 of those companies, including Company G, appeared to be owned by one individual, Individual E, and did not appear to possess the capacity to manufacture gold jewelry.

30.    According to Commercial Registration Certificates ("CRCs") issued under the authority of the Sultanate of Oman Ministry of Commerce and Industry over multiple years, approximately 8 of these companies operated under a common ownership structure owned by Individual E, an Omani citizen.

31.    Between in or around August 2021 and October 2021, an investigator assigned to the HSI office in Oman (the "investigator") visited many of the purported manufacturers identified above in an undercover capacity. The investigator discovered that the purported manufacturers' business premises ranged from small retail stores with no visible goldsmithing/manufacturing capabilities in the public view to a small shop at which the agent was told the store does not sell any gold or jewelry.

---

[6] Throughout this Affidavit, I use the term "filed" to also encompass "caused to be filed."

32. For example, in or around August 2021, an investigator assigned to the HSI office in Oman (the "investigator") covertly visited Company G. The premises consisted of a small room measuring approximately 15 by 15 feet, with a loft of a smaller size above. A sign on the front read "[Company G]" and "RETAIL OF JEWELLERY." Despite the sign, the investigator did not observe any jewelry on display or for retail sale during normal business hours. There was no observable gold jewelry manufacturing machinery. The investigator spoke with Individual E, the registered owner of Company G, among other companies, who was present at the premises. Individual E stated, in summary, that Company G had not exported any gold items for 4-5 years, and they only make gold items to sell locally.

33. Company M submitted invoices purportedly from the Omani manufacturers discussed above to U.S. Customs support its gold jewelry imports. These invoices appear to have been made using nearly identical invoice templates. More specifically, despite being separate manufacturers, physically located at different cities in Oman, the invoices were nearly identical in terms of appearance, design, format, and nomenclature. The similarities extended to the telephone number, postal code, post office box, commodity descriptions, and the unique format in which Company M's address was written. In some invoices, the P.O. Box number and postal codes were inverted.

34. Based on my training and experience, the training and experience of other law enforcement officers with whom I have spoken, and my knowledge of the investigation, I believe that the similarities in the details of the sales invoices, along

with the inversion of the P.O. Box number and postal codes, suggest that the invoices are fabricated, and that these purported gold jewelry manufacturers are shell companies and not the true manufacturers of the jewelry.

35. Based on the information collected, CBP estimates that, as a result of the use of the false duty-free rate on gold jewelry Company M imported from Company N, the United States has been deprived of approximately $11 million in duties.

36. Based on the information in this Affidavit, I believe there is probable cause that KAPADIA conspired with Individuals G and H from in or around April 2018 through on or around April 2020, to enter goods into the United States by means of false statements, namely, by stating that gold jewelry was manufactured in Oman when it was not, in violation of Title 18, United States Code, Section 542, all in violation of Title 18, United States Code, Section 371.

FURTHER AFFIANT SAYETH NOT.

/s/ Matthew T. Gauder (MDW w/ permission)
MATTHEW T. GAUDER
Special Agent, Homeland Security Investigations
(HSI)

SWORN TO AND AFFIRMED by telephone May 27, 2024.

Honorable M. DAVID WEISMAN
United States Magistrate Judge